UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Elizabeth A. Ryan**

    **v.**                                     Civil No. 08-cv-17-PB
                                        Opinion No. 2008 DNH 148
**Michael J. Astrue, Commissioner,**
**Social Security Administration**


## MEMORANDUM AND ORDER

Elizabeth Ryan suffers from Huntington's Disease, a
progressive neurological disorder that was not diagnosed until
several years after she stopped working.  An Administrative Law
Judge ("ALJ") denied her claim for social security disability
benefits ("DIB"), finding that she was not disabled as of the
last date that she was eligible for an award of DIB.  Ryan faults
the ALJ for failing to consult a medical advisor before making
this determination.


## I.  BACKGROUND[1]

### A.  Factual Background

Ryan was forty-two years old when she applied for DIB in
April 2005.  In her application, she alleged that she had been

---

[1] Citations to the Administrative Transcript are indicated
as "Tr.".

disabled due to Huntington's Disease since March 15, 1997, when
she stopped working.  Tr. at 47.  Ryan worked as a legal
secretary from 1984-1996, as the recording secretary for the
local planning board from 1994-1995, and in a job involving pet
adoption and cleaning for a brief period in early 1997.  Tr. at
51.  Ryan's date last insured, for purposes of DIB calculations,
is March 31, 2001.[2]  Ryan has a husband, Kevin, and a son, Connor
(born in 1994).

1.   Background on Huntington's Disease

Huntington's Disease, also known as Huntington's chorea, is
"a neurodegenerative disorder, with onset usually in the third or
fourth decade, characterized by chorea and dementia."  Stedman's
Medical Dictionary 343 (27th ed. 2000).  "Chorea" is defined as
"irregular, spasmodic, involuntary movement of the limbs or
facial muscles, often accompanied by hypotonia."  Id. at 342.
There is no cure or effective treatment for Huntington's Disease.
Tr. at 150.  The symptoms are varied and progress over time:

> Early signs of the disease vary greatly from person to
> person. A common observation is that the earlier the
> symptoms appear, the faster the disease progresses.

---

[2] Under the Social Security Act, in order to be eligible for
disability insurance benefits, Ryan must demonstrate that she was
disabled on or prior to her date last insured.  See 42 U.S.C. §
423(c).

Family members may first notice that the individual experiences mood swings or becomes uncharacteristically irritable, apathetic, passive, depressed, or angry. These symptoms may lessen as the disease progresses or, in some individuals, may continue and include hostile outbursts or deep bouts of depression.

HD may affect the individual's judgment, memory, and other cognitive functions.  Early signs might include having trouble driving, learning new things, remembering a fact, answering a question, or making a decision. Some may even display changes in handwriting.  As the disease progresses, concentration on intellectual tasks becomes increasingly difficult.

In some individuals, the disease may begin with uncontrolled movements in the fingers, feet, face, or trunk.  These movements — which are signs of chorea — often intensify when the person is anxious.  HD can also begin with mild clumsiness or problems with balance.  Some people develop choreic movements later, after the disease has progressed. They may stumble or appear uncoordinated.  Chorea often creates serious problems with walking, increasing the likelihood of falls.

The disease can reach the point where speech is slurred and vital functions, such as swallowing, eating, speaking, and especially walking, continue to decline.  Some individuals cannot recognize other family members.  Many, however, remain aware of their environment and are able to express emotions.

Some physicians have employed a recently developed Unified HD Rating Scale, or UHDRS, to assess the clinical features, stages, and course of HD.  In general, the duration of the illness ranges from 10 to 30 years.  The most common causes of death are infection (most often pneumonia), injuries related to a fall, or other complications.

National Institute of Health Publication 98-49, National

Institute of Neurological Disorders and Stroke, Huntington's

<u>Disease:  Hope Through Research</u>, http://www.ninds.nih.gov/
disorders/huntington (Jul. 25, 2008).

Huntington's Disease is a familial genetic disease, passed
from parent to child due to a genetic mutation.  <u>Id.</u>  Children
born to a parent who has Huntington's Disease have a fifty
percent chance of inheriting the Huntington's Disease gene.  <u>Id.</u>
A person who inherits the gene will develop the disease.  <u>Id.</u>

2.  <u>Medical History</u>

The only medical evidence in the record prior to Ryan's date
last insured is a doctor's visit in January 2001, when Ryan
sought treatment for a sore throat.  <u>Tr.</u> at 107.  Ryan was
treated for acute pharyngitis, and the doctor's office notes
contain no observations or reports of balance problems, cognitive
problems, or any other medical issue.  <u>Id.</u>

In August 2002, Ryan saw Dr. Joohahn Kim seeking treatment
for problems with her balance that she had been experiencing over
the past year.  <u>Tr.</u> at 106.  According to Dr. Kim's office notes,
both Ryan and Dr. Kim thought that the balance issues might be
due to wax build-up in her ears.  <u>Id.</u>  Dr. Kim recorded that Ryan
denied problems of vertigo, tinnitus, parathesias, numbness,
tingling, or weakness.  <u>Id.</u>  Upon physical examination, Dr. Kim
found no abnormalities and noted a negative Romberg test, normal

-4-

deep tendon reflexes, and normal finger-to-nose coordination.[3]
Id.  Dr. Kim syringed out Ryan's ear wax and advised Ryan to
return if her condition did not improve.  Id.

Ryan did not return to Dr. Kim for follow-up visits.  Her
next contact with a health care provider occurred in May 2004
after her husband, Kevin, contacted a doctor about Ryan's balance
and dizziness problems.  Tr. at 105.  Ryan was evaluated in May
2004; at that time, Ryan and her husband reported to Physician's
Assistant Brian Kimball that she had been having balance problems
for at least eight months, and possibly for well over one year,
with gradual worsening.  Tr. at 102.

Ryan saw several doctors in May 2004 as she and her husband
sought a diagnosis for her condition.  The doctors consistently
noted that Ryan reported problems with balance dating back twelve
to eighteen months, and that she displayed problems with gait and
balance as well as dysarthric[4] speech and problems following

_____

[3] Romberg's test (also known as Romberg's sign) is a
neurological test in which "with feet approximated, the subject
stands with eyes open and then closed; if closing the eyes
increases the unsteadiness, a loss of proprioceptive control is
indicated, and the sign is positive."  Stedman's Medical
Dictionary 1640 (27th ed. 2000).

[4] Dysarthria is "a disturbance of speech due to emotional
stress, to brain injury, or to paralysis, incoordination, or
spasticity of the muscles used for speaking."  Stedman's Medical
Dictionary 550 (27th ed. 2000).

directions.  Tr. at 98-103.  Ryan was referred to a neurologist,
Dr. Gerald Indorf, who ordered testing for Huntington's Disease.
Tr. at 98-100.  Genetic testing confirmed that Ryan had
Huntington's Disease, and research into her family history
indicated that her estranged father had died from the disease.
Tr. at 97, 108-09.

Following the diagnosis of Huntington's Disease, Ryan's
medical records show that she received routine medical care and
genetic counseling.  Tr. at 90-96.  Ryan began outpatient care
including nutrition counseling and physical therapy at the
Huntington's Disease Clinic at Tewksbury Hospital in Tewksbury,
Massachusetts.  Tr. at 123-124.  In November 2004, Dr. Steven
Hersch, a neurologist and specialist in Huntington's Disease,
performed a neurological examination noting that Ryan was "in
fairly early stages with more cognitive than involuntary motor
dysfunction at present."  Tr. at 128-30.  Speech-Language
Pathologist Kathryn Wolman evaluated Ryan and concluded that she
demonstrated dysarthria, functional cognition and comprehension,
and functional expressive language abilities.  Tr. at 128-40.

Ryan was re-evaluated by both Wolman and Dr. Hersch in March
2005.  Dr. Hersch noted that Ryan had "done well since the last
visit"; Wolman's assessment was identical to her assessment in

-6-

the November 2004 report.  Tr. at 126-27, 141-43.

In connection with her application for DIB and related proceedings, Dr. Hersch and Dr. Indorf supplemented the record with letters regarding their professional opinions about the onset of Ryan's illness.  Tr. at 150-54.

Dr. Indorf wrote in June 2007 that while an exact date for the onset of Ryan's symptoms is unclear, Ryan was "quite symptomatic" in 2004 when he first diagnosed her disease.  Tr. at 152.  Dr. Indorf noted that Ryan was unable to balance her checkbook beginning a year and a half prior to the 2004 diagnosis and that she lost her secretarial job in 1997 because of cognitive decline.  Id.  Dr. Indorf opined that Ryan was totally disabled from work and met the requirements of Social Security Listing of Impairment 11.17 because she had disorganization of motor function that was persistent and significant in two extremities.  Tr. at 153.  Dr. Indorf noted, however, that he could not say whether Ryan's disorganization of motor function was of Listing severity prior to March 30, 2001,[5] because he first examined Ryan in May 2004.  Id.  At the time of his opinion, Dr. Indorf had not examined Ryan in two years.

_____

[5] Doctors Indorf and Hersch opined about Ryan's status as of March 30, 2001; Ryan's actual date last insured is March 31, 2001.  The discrepancy is not relevant to Ryan's DIB eligibility.

In a letter dated June 7, 2007, following an examination of Ryan on the same day, Dr. Hersch stated that he was certain that Ryan would have been symptomatic for at least four to five years prior to the time he first examined Ryan in November 2004.  Tr. at 150.  Dr. Hersch stated that he reached this conclusion because of his specialized knowledge of the progressive nature of Huntington's Disease and because Ryan was already "markedly symptomatic" in 2004.  Tr. at 150.  Dr. Hersch opined that Ryan "is totally and permanently disabled."  Tr. at 151.  Like Dr. Indorf, he concluded that Ryan met Listing 11.17 due to her significant disorganization of motor function in two extremities. Tr. at 154.  Dr. Hersch further opined that Ryan's disorganization of motor function was of Listing severity prior to March 30, 2001.  Id.

3.   Evidence from friends and employers

Because there are limited medical records prior to 2001, Ryan's friends and employers submitted "lay" evidence as to their observations about Ryan's symptoms prior to her diagnosis.

Brenda Kennedy, a nurse and parent of a classmate of Ryan's son, Connor, recalled that Ryan exhibited both cognitive and physical symptoms of Huntington's Disease in the fall of 1999 or spring of 2000, when the two were helping with a class party at

the children's school.  Tr. at 77.  Kennedy recalled that Ryan
had slow, slurred speech, an unsteady gait, a tremor in one hand,
and jerky gross motor skills.  Id.  She also remembered that Ryan
had difficulty participating in and following conversation, at
times making out-of-context comments.  Id.  Kennedy stated that,
at first, she thought Ryan was drunk or on drugs, but as she
continued to see Ryan over the next two to three years due to
their sons' friendship, she realized that the problem was not
alcohol or drugs, but possibly a neurological condition.  Id.

      Heidi Hutchinson, a friend of the Ryans, recalled that Ryan
had a clearly noticeable twitch in her upper body at a party in
June 2000, like a shrugging of the shoulders or a quick shake of
the upper body.  Tr. at 78.  Hutchinson remembers that other
friends, who were not acquainted with Ryan, asked what was wrong
with Ryan.  Id.  Pam Daragon, a longtime friend of Ryan's,
similarly recalled that, at social events, people would ask her
whether Ryan was drunk due to the jerky movements of Ryan's body,
her altered speech pattern, and her out-of-context comments in
conversation.  Tr. at 80.

      Shannon Aubin, Ryan's sister-in-law and friend since
childhood, recalled a gradual change in Ryan beginning in 1994
after Connor's birth.  Tr. at 81-83.  In 1995, Aubin recalled

-9-

that Ryan had difficulty at her job as a recording secretary to
the planning board, which Aubin found surprising because Ryan had
been a confident and career-oriented legal secretary just a few
years before.  Id. at 82.  Aubin noticed that Ryan's movements
became robotic and twitchy, especially in her wrist movement, and
Aubin was surprised to see that Ryan, who had been a graceful
ballet dancer, had problems with balance.  Id.  Specifically,
Aubin recalled Connor's fifth birthday party in 1999, when Ryan
had difficulty coordinating her motor skills to play a "skee
ball" game with her son, despite the fact that Aubin and Ryan had
frequently played the game as children.  Id.  Like Hutchinson and
Daragon, Aubin noted that numerous friends had asked her what was
wrong with Ryan at social events including a July 4th party in
1999 and a New Year's Eve party in 2000.  Id.

Family friends Lisa and Rob Stemska recalled that, after
Connor's birth in 1994, Ryan began acting clumsy and repeating
herself in conversation.  Tr. at 84.  Lisa recalled that Ryan
repeatedly spilled her drink at a social gathering in fall 1996.
Id.  Another friend, Jennifer McCormick, who is also a nurse,
noticed that Ryan's gait was unsteady and uneven in May 1999 and
that her thought process seemed off.  Tr. at 85.  McCormick
recalled that friends asked whether she knew what was wrong with

-10-

Ryan.  Id.  In July 2000, at her son's birthday party, McCormick saw that Ryan had difficulty retracting her hand after being handed a beverage, as if there were a delay between her mind and her body in processing the task.  Id.  From 2000 to the present, McCormick stated that she sees constant changes in Ryan's status, including problems with dysphasia, balance, and grip.  Id. Another friend, Cora Trimbur, who is also a nurse, also noticed gradual deterioration and had speculated that Ryan might suffer from cerebral palsy.  Id. at 86.

Claire Dodge was Ryan's employer when she worked as a recording secretary for the planning board (1994-1995), and Dodge recalled that Ryan displayed problems with lethargy, concentration, and speech that ultimately resulted in Ryan being dismissed from the position after a short period of time.  Tr. at 87-88.  Specifically, Dodge recalled that Ryan would appear sleepy and seemed "lost" on many days.  Id.  Ryan would have difficulty concentrating on tasks and remembering instructions, and she would get confused when taking notes.  Id.  Dodge noticed specifically that Ryan would have difficulty putting her thoughts into words or pronouncing words or phrases, almost as if she suffered from a stutter.  Id.

B.    **Procedural History**

Ryan applied for DIB on April 28, 2005, alleging that she became unable to work as of March 15, 1997, due to Huntington's Disease.

The SSA found that Ryan was not disabled and initially denied her claim on October 17, 2005.  Tr. at 34-36.  Ryan requested a hearing by an Administrative Law Judge ("ALJ"); the hearing was held before ALJ Robert S. Klingebiel on June 12, 2007, in Manchester, New Hampshire.  At the hearing, Ryan and her husband testified, and Ryan was represented by counsel.

Ryan testified that she had trouble sleeping in the mid-1990s, which is why she appeared sleepy to Dodge when working for the planning board.  Tr. at 165-66.  When asked about her physical and cognitive limitations in 2000 and 2001, Ryan reported that she had trouble with balance and frequently fell during that time period.  Tr. at 168-69.  Ryan testified that she had been in numerous car accidents and stopped driving around 2003 or 2004 after an incident in which she was suspected of driving under the influence.  Tr. at 173.

Kevin Ryan also testified at the hearing.  He recalled that Ryan had been having problems finishing her tasks at work beginning in 1994.  Tr. at 178-80, 185-86.  Kevin also recalled

-12-

that Ryan would wake up screaming in the middle of the night,
make out-of-context comments in conversation, and spill things
due to dexterity problems.  Tr. at 182-83.  Kevin testified that
Ryan was in at least three car accidents between 1994 and 2001,
including an accident in which she drove off the road despite the
fact that the road was straight and no other car was involved,
and an accident where she hit a pedestrian.  Tr. at 181, 188-91.
Kevin also said that he noticed dents all around the keyhole on
the outside of Ryan's car.  Tr. at 190.

     In a written decision dated July 26, 2007, the ALJ applied
the five-step process described in 20 C.F.R. § 404.1520 and
concluded that Ryan was not disabled.  See Tr. at 11-22; see also
42 U.S.C. § 416(i)(1)(A).  The ALJ concluded that Ryan had not
engaged in substantial gainful activity during the relevant
period from March 15, 1997, to March 31, 2001, and that she had
the severe impairment of Huntington's Disease.  Tr. at 16.  The
ALJ next concluded that Ryan's impairment did not meet the
Listing of Impairment for Huntington's Disease prior to her date
last insured.  The Listing requires either chronic brain syndrome
or disorganization of motor function, as defined in 20 C.F.R. §

-13-

404, Subpart. P, Appendix 1.[6]  Although Ryan's treating physician, Dr. Steven Hersch, gave a retrospective opinion in July 2007 that Ryan did meet the Listing prior to March 31, 2001, the ALJ found that Dr. Hersch's opinion was inconsistent with the medical evidence in the record with regard to Ryan's condition as of her date last insured (i.e., her 2001 and 2002 doctor visits).  <u>Tr.</u> at 17.

The ALJ concluded at step four that Ryan could not perform her past relevant work as a legal secretary because her condition prevented her from understanding, remembering, and carrying out the complex instructions that the job required.  <u>Tr.</u> at 21. Nevertheless, the ALJ concluded that Ryan retained the RFC to perform light, unskilled work as of her date last insured, with the additional limitation that she could not perform work at unprotected heights due to perceived balance problems.  <u>Tr.</u> at 18.  The ALJ found that the objective medical evidence, namely the medical records from 2001 (doctor's visit for sore throat)

---

[6] Disorganization of motor function is defined as: "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. § 404, Subpt. P, App. 1, Listing of Impairment 11.17 (incorporating language from Listing of Impairment 11.04B).  Chronic brain syndrome is defined by reference to Listing of Impairment 12.02, which outlines several requirements for severity.

and 2002 (visit to Dr. Kim for problems with balance) and Ryan's
lack of medical treatment, "is inconsistent with her allegations
as to the severity of her symptoms and limitations through March
31, 2001." Tr. at 20.  The ALJ found that opinions submitted by
Drs. Hersch and Indorf were entitled to "limited weight to the
extent that they are supported by the remaining evidence of
record" because the doctors had not treated Ryan prior to 2004.
Tr. at 21.  The ALJ also found that while the lay evidence showed
"limited balance problems as well as cognitive deficits," the
evidence of the record, as a whole, demonstrated that Ryan was
capable of performing a range of light, unskilled work.  Id.  The
ALJ found at step five that based on Ryan's age, education, work
experience, and RFC, there existed jobs in significant numbers in
the national economy that she could have performed during the
relevant period.  Id.

The Appeals Council denied Ryan's request for review on
December 14, 2007.  Tr. at 4-6.  Ryan then filed for review in
this court pursuant to 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

I am authorized pursuant to 42 U.S.C. § 405(g) to review the
pleadings submitted by the parties and the transcript of the

-15-

administrative record and enter a judgment affirming, modifying, or reversing the Commissioner's final decision.  My review is limited to whether the Commissioner (through the ALJ and the Appeals Council) applied the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The Commissioner's findings of fact are accorded deference as long as they are supported by substantial evidence.  Ward, 211 F.3d at 655.  I must uphold these factual findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  The Commissioner's factual findings are conclusive if there is substantial evidence to support his or her decision, even if the record "arguably could support a different conclusion."  Id. at 770.  The findings are not conclusive, however, when they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35.

The Commissioner is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the Commissioner, not the role of this court, to resolve conflicts in the evidence.  Id.

### III.  **ANALYSIS**

The ALJ failed to consult with a medical advisor before he determined that Ryan was not disabled as of her date last insured.  Ryan cites this failure in arguing that the ALJ violated Social Security Ruling ("SSR") 83-20, which provides in pertinent part that "the administrative law judge ("ALJ") should call on the services of a medical advisor when onset [of a disability] must be inferred."  The Commissioner responds by arguing that SSR 83-20 is inapplicable because the ALJ denied her claim without making a finding that she was disabled.  I find the Commissioner's argument unpersuasive.

Courts agree that SSR 83-20 ordinarily requires an ALJ to consult a medical advisor when the ALJ has made a finding of disability but the onset of the disability must be inferred from ambiguous evidence.  See, e.g., Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001); Grebenick v. Chater, 121 F.3d 1193, 1201 (8th

-17-

Cir. 1997); Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995).
The law is less clear, however, as to whether SSR 83-20 applies
when the ALJ skips over the question of present disability and
denies a DIB claim by determining that the claimant was not
disabled as of her date last insured.   Compare Grebenick, 121
F.3d at 1201 (a finding of disability is not required to trigger
application of SSR 83-20), with Key v. Callahan, 109 F.3d 270,
274 (6th Cir. 1997) (SSR 83-20 applies only where ALJ makes a
finding of disability).

The Commissioner cites supportive case law but does not
otherwise defend his argument that SSR 83-20 is inapplicable in
this case.  Reading the ruling on my own, I find no support for
the Commissioner's position either in the language of SSR 83-20
or in the underlying policies that the ruling was designed to
serve.  SSR 83-20 straightforwardly states that an ALJ "should
call on the services of a medical advisor when onset must be
inferred."  It does not authorize ALJs to circumvent the ruling
by withholding a finding on present disability and denying the
claim based upon a determination that the claimant was not
disabled as of her date last insured.  In short, there is no

support in the text of SSR 83-20 for the Commissioner's position.[7]

The Commissioner's interpretation of SSR 83-20 is also inconsistent with the public policy that the ruling was intended to serve. As the ruling notes, an onset date finding will often be determinative of a claim for benefits. Such findings can be extremely difficult to make when a claimant suffers from a progressive impairment such as Huntington's disease that is not diagnosed until long after the alleged onset date of the claimed disability. This difficulty does not disappear when an ALJ bypasses a determination of present disability and instead denies a DIB claim based on a finding that the claimant was not disabled as of her date last insured. Accordingly, there is no good reason why SSR 83-20 should be limited to cases in which the ALJ makes a determination of disability before addressing the onset date of the disability.

---

[7] Some courts attach significance to the statement in the introduction to SSR 83-20 that "in addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability." See, e.g., Eichstadt v. Astrue, 2008 WL 2764636, at *2; Key, 109 F.3d at 274. This sentence merely acknowledges the fact that an ALJ must make an onset date determination if he finds that the claimant was disabled when she applied for benefits. It does not in any way suggest SSR 83-20 is inapplicable in cases where an ALJ denies a claim for DIB by finding that the claimant was not disabled as of her date last insured.

The present case illustrates why an ALJ ordinarily should consult a medical advisor when his determination of the onset date of a disability is based on inference.  It is undisputed that Ryan suffers from a progressive impairment that eventually will lead to complete disability.  Moreover, there is substantial medical evidence in the record to support Ryan's claim that she was disabled when she was diagnosed with Huntington's Disease. Rather than address this evidence by ruling on the issue of present disability, the ALJ bypassed the issue and denied her claim because he found that she was not disabled as of her date last insured.  To make this finding, he had to draw inferences concerning the onset date of her disability.  He also had to discount expert medical evidence in the record that supported Ryan's claim, and disregard lay testimony that ran counter to his decision.  Thus, this is precisely the kind of case that SSR 82-30 was intended to cover.

## IV.  CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), I vacate the Commissioner's decision and remand this case for further proceedings that are consistent with this Memorandum and Order. The plaintiff's Motion to Reverse the Decision of the

Commissioner (Doc. No. 6) is granted to the extent that it is
consistent with this Order.  The defendant's Motion for an Order
Affirming the Decision of the Commissioner (Doc. No. 7) is
denied.  The clerk is directed to enter judgment in accordance
with this Order and close the case.

 SO ORDERED.


     /s/Paul Barbadoro
     Paul Barbadoro
     United States District Judge

August 21, 2008

cc:  Raymond Kelly, Esq.
  Seth Aframe, Esq.